John D. McKay, Esq.
California Bar No. 220202
**PARK AVENUE LAW LLC**
201 Spear Street, Suite 1100
San Francisco, CA 94105
johndmckayatty@gmail.com
(434) 531-9569 Telephone
(407) 264-6551 Fax
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

| | |
|---|---|
| RENA KAY SOVERNS, | CASE NO: 5:20-cv-6258-BLF |
| Plaintiff, | |
| v. | **PLAINTIFF'S TRIAL BRIEF** |
| DELTA AIR LINES, INC. | |
| Defendant. | **Trial Date: May 1, 2023** |

Pursuant to the Court's Standing Order on Civil Jury Trials, Plaintiff, Rena Kay Soverns, ("Rena") submits this Trial Brief for the Court's consideration.

**I.      Rena's claim for damages is based on the "eggshell plaintiff rule."**

This is a simple case, now that Defendant, Delta Air Lines, Inc. ("Delta"), has formally stipulated that it "will not contest its liability for being the sole cause of the subject accident on July 6, 2019. . . ." (ECF No. 84). With negligence conceded, the only remaining issues for the jury to decide are whether Rena was harmed by the accident aboard Delta's airliner on July 6, 2019, whether Delta's negligence was a substantial factor in causing Rena's harm, and the amount of Rena's damages. *See,* Joint Revised Proposed Jury Instructions filed April 24, 2023 (ECF No. 92), at Instructions 29 and 33.

Rena will present her own testimony, as well as the testimony of the following witnesses:

- Danielle, her adult daughter
- Darren, her adult son
- Brenden, Danielle's teenage son
- Mary Roberts, M.D., Rena's primary care doctor for several decades at the VA

which will establish that she led a remarkably active life in the years prior to the July 6, 2019 accident, going on camping trips twice a year, creating and maintaining a garden in the backyard of her house, being an active volunteer at her children's school when they were younger, fishing with Brenden and teaching him about the plants and flowers in her garden, cooking for the entire family, keeping a tidy house, doing laundry, going fishing with Brenden, and attending Brenden's touch football games. She will testify that she never had, prior to the accident on July 6, 2019, lower back pain of the type or severity that she suffered immediately upon striking her back on the upright edge of a passenger seat on the airliner on that date, and that she has continued to suffer every day since the accident. All the witnesses will testify to a marked change in Rena's life since the accident. She is in constant pain from her low back, which builds during the day and is affected by nearly anything that she does. She lives in constant fear of doing something that will make the pain even worse, such as twisting, or slipping, or lifting an object of any substantial weight. As a result, her life activities have had to be significantly curtailed. She does not venture into her backyard if there is any possibility that she might slip on wet grass. She no longer goes on camping trips. She finds it difficult to cook or do laundry, and she frequently expresses embarrassment at not being able to keep a clean house. She no longer attends Brenden's games, because sitting on bleachers is too painful for her. She is unable to pick up and hold Brenden's little sister, who lives with her and is approaching two years of age. She only showers when someone from her family can stand outside the bathroom, ready to come to her rescue if she twists or falls in the shower. By each afternoon, she must retire to her bed

because the pain is so debilitating. She tries to keep up her spirits, but she has lost her enjoyment of life.

Her neurosurgeon, Dragan F. Dimitrov of Monterey Spine and Joint, has testified in his deposition and will testify at trial that Rena presented at Community Hospital of the Monterey Peninsula ("CHOMP") on the Monday morning following the Saturday accident with a Grade II anterolisthesis at L4-L5 and a disc herniation at the same level of her spine. "Anterolisthesis" is a form of spondylolisthesis, which is the slippage of one vertebral body over the one below it ("antero" means the slippage is forward, toward the navel).[1] The condition is illustrated by the following video: https://www.youtube.com/watch?v=P8XgNZRKuSQ. It can cause stenosis, which is the narrowing of the spaces that nerves pass through. Rena does not contend that the accident caused her anterolisthesis, even though she did not know that she had the condition until after the accident had occurred. Dr. Dimitrov will testify that anterolisthesis at L4-L5 is a common finding in older patients, and it is frequently asymptomatic, as Rena's was prior to the accident. She did go to the emergency room of a local hospital in her hometown several months prior to the accident, on April 26, 2019, complaining of a number of symptoms that included "back pain radiating to left leg." An x-ray taken during that visit revealed "a 9mm anterolisthesis of L4 on L5 with narrowing of the L4-L5 disc space," but Rena will testify that nobody informed her of that finding during the ER visit, and she returned home feeling fine. The back pain and left leg weakness that caused her to go to the ER (in concert with "chronic dental issues, left facial pain and chest pain) did not return between April 26 and the accident on July 6. There is no evidence of a disc herniation prior to the accident, but one was found after the accident.

---

[1] Grade II means that the slippage was between 25% and 49% of the vertebral body over the vertebral body beneath. Rena's slippage was measured at 10mm, which corresponds to about 29% of an average vertebral body.

Dr. Dimitrov suspected a disc herniation when he examined Rena in the ER at CHOMP, upon finding that she had a left "foot drop," or a pronounced weakness in her foot strength: "So the foot drop fits well with the stenosis at L4-5 and this potentially acute disc herniation at L4-5." Deposition of Dragan Dimitrov, M.D. taken on April 21, 2023 ("Dimitrov Dep."), at 28. He testified that such a foot drop would have affected a person's walking, and anyone watching the patient walk would have noticed that something was wrong with her foot. *Id.* at 59. Danielle and Brenden will testify that they watched Rena walk until the time that she went into the jet bridge to board the airliner, and her gait was unaffected. As Dr. Dimitrov summarized:

> So if you're trying to weave a story together and you're in the emergency room or in the hospital seeing this patient you'd say, well, why does she have this all of a sudden on the left? Why does she have all this weakness? And you'd say, well, it looks like maybe in the setting of all the severe narrowing **this new disc herniation on the left at L4-5 happened and maybe that's why she has this new weakness in her left foot.**

*Id.* at 29 (emphasis added). He went on to testify that a blow to the lumbar spine by something like an upright seat back colliding with it could cause a disk herniation, *id.* at 55, and the herniation in the context of her preexisting degenerative changes and structural narrowing of the disc spaces led to significant neurological problems:

> . . . probably the most likely medical scenario is she had all of the degenerative problems—she's a smoker, she had this fall with the suitcase, and then, boom, this little disc herniation pops out, which isn't very big, but in the setting of something that's already very narrow, you know, so to speak, **is the straw that broke the camel's back and brings on these more significant neurologic problems**.

*Id.* at 56 (emphasis added). He noted that Rena was "predisposed to having more of an injury" because of the condition of her back. *Id.* at 58.

Thus, this case presents a classic example of the "eggshell plaintiff rule": "The tort-feasor takes the person he injures as he finds them. If, by reason of some preexisting condition, his victim is more susceptible to injury, the tort-feasor is not thereby exonerated from liability." *Rideau v. Los Angeles Transit Lines,* 124 Cal.App.2d 466, 471, 268 P.2d 772, 775 (Cal. App.

1954); *see also,* CACI 3928 (reflected in ECF No. 92 at Instruction 40). "'[A] tortfeasor may be held liable in an action for damages where the effect of his negligence is to aggravate a preexisting condition or disease. Plaintiff may recover to the full extent that his condition has worsened as a result of defendant's tortious act.'" *Sanchez v. Kern Emergency Med. Transp. Corp.,* 8 Cal.App.5th 146, 168, 213 Cal.Rptr.3d 830, 848 (Cal. App. 2017) (quoting *Ng v. Hudson,* 75 Cal.App.3d 250, 255, 142 Cal.Rptr. 69 (Cal. App. 1977), *overruled on other grounds by Soule v. General Motors Corp.,* 8 Cal.4th 548, 574, 580, 34 Cal.Rptr.2d 607, 882 P.2d 298 (Cal. 1994)); *see also* CACI 3927 (reflected in ECF No. 92 at Instruction 39). Rena's anterolisthesis was asymptomatic, or largely so, prior to the July 6, 2019 accident, but the accident likely caused the disc herniation that, in the narrow space caused by the anterolisthesis, caused Rena's pain.

      The testimonial evidence to be presented by Rena and her family members and friend, along with the testimony of Dr. Roberts as to a lack of any prior complaints of this nature, and Dr. Dimitrov's testimony that the accident likely caused the disc herniation that was "the straw that broke the camel's back," all support a finding that the accident did harm Rena, and that Delta's negligence was a substantial factor in causing her harm.

      The only evidence that Delta plans to introduce to the contrary is the testimony of its expert Clement K. Jones, M.D. His opinions are not persuasive, and likely not even admissible under Rule 702 and *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579 (1993). Although Dr. Jones produced a 49-page initial report and a 14-page supplemental report, the bulk of those reports consists of recitations from Rena's past medical records. The reports contain virtually no expert analysis by Dr. Jones. Both reports contain the phrase, "To a reasonable degree of medical probability more likely than not the subject incident on 07/06/2019 did not cause, aggravate, exacerbate, or in any way worsen any of this underlying and pre-existing imaging abnormalities [*sic*]," or variations of that phrase, tacked to the ends of paragraphs that parrot the prior medical

records. But the conclusory statement is bare *ipse dixit* that is unconnected to any analysis by him to support the conclusion. He merely states that Rena had some prior complaints of back pain (which is undisputed, although it was of a different nature), and findings of longstanding degenerative changes (again, undisputed but largely asymptomatic prior to the accident), and unrelated medical issues that he catalogs at great length for no discernable reason, therefore the accident did not cause her current condition. The connection between the prior records and the "therefore" is notably absent. "[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997). "As a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained." *United States v. Hermanek,* 289 F.3d 1076, 1094 (9th Cir. 2002). Just because Dr. Jones is an orthopedic surgeon does not mean that he can toss opinions into this litigation without explaining how he arrived at them. *See Claar v. Burlington N. R.R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994) ("[T]he district court repeatedly ordered the experts to explain the reasoning and methods underlying their conclusions.... [Because the experts'] affidavits are devoid of any such explanation ... the district court could not make the findings required by Rule 702[.]"). Therefore, nothing that Delta plans to offer in evidence provides any basis to contradict Rena's substantial evidence.

    II.    **Rena's condition is painful and permanent**.

Unfortunately, the operation performed by Dr. Dimitrov did not alleviate her pain. As Dr. Dimitrov testified at his recent deposition, he told Rena prior to the surgery that it would not guarantee a reduction in her pain. Dimitrov Dep. at 36. Steven D. Feinberg, M.D., who is board certified in Physical Medicine and Rehabilitation, and also board certified in Pain Medicine, and is an Adjunct Clinical Professor at Stanford University School of Medicine, has extensively

evaluated Rena and concluded that her present condition is a permanent one. Delta's proposed expert Maureen D. Miner, M.D., who is also a pain management expert, agrees with Dr. Feinberg's opinions. The parties have stipulated that, according to the National Center for Health statistics incorporated into CACI 3932, a 68-year-old female living in the United States has a statistical life expectancy of 19.1 years. *See* ECF No. 92, at Instruction No. 42. (Rena is currently 67, but she will turn 68 during the trial, on May 7). Delta plans to argue that her current medical conditions and smoking habit—which is at most half a pack a day—will shorten her lifespan. However, Rena will testify that she comes from a tough farming and military family in which many relatives lived into their 90's.

### III. Rena is claiming only noneconomic damages.

In light of the *Howell* issue raised by Delta and the fact that the VA has paid all of her medical treatment costs, Rena has opted to pursue only noneconomic damages for past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, anxiety, humiliation, and emotional distress. *See* ECF No. 92, at Instruction No. 36. The only standard for such damages is that they be an amount that "a reasonable would estimate as fair compensation." *Duarte v. Zachariah,* 22 Cal.App.4th 1652, 1664-65 (Cal. App. 1994).

Dated this 24th day of April, 2023

                                                            s/ John D. McKay
                                                            John D. McKay
                                                            Counsel for Plaintiff